# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

LINDA R. MICHAEL, )
)
       Plaintiff, )
)   Civil Action No. 2:16-cv-00473
v. )
)
QUAKER VALLEY SCHOOL DISTRICT )
et al., )
)
       Defendants. )

## **OPINION**

**Mark R. Hornak, Chief United States District Judge**

Plaintiff Linda A. Michael was terminated from her position as a full-time paraprofessional with Defendant Quaker Valley School District in 2014 after multiple allegations of unprofessional behavior towards students. She contends that the District denied her procedural due process before her suspension and eventual termination. She also avers that the District's investigation into the allegations was pretextual, and the District's true motivation was to retaliate against her for speaking out in 2012 against its plan for a new parking lot or drop-off zone for the High School. However, Plaintiff has not set forth evidence from which a reasonable jury could conclude that she was denied procedural due process or that the disciplinary actions taken by the District were connected with her protected speech. For the reasons stated in this Opinion, the Court will grant Defendant Quaker Valley School District's Motion for Summary Judgment.

# I.    BACKGROUND

## A.    Factual background[1]

Michael was employed by Quaker Valley School District ("Quaker Valley" or the "District") as a paraprofessional from August 2010 until her suspension and ultimate resignation on April 27, 2015. (Def.'s Concise Statement of Material Facts ("Def.'s CSMF"), ECF No. 89, ¶¶ 1, 64–66.)[2] During the events involved in this dispute, Dr. Barbara Mellett was the Principal of Osborne Elementary School in Quaker Valley, and Leah Lindenfelser was Michael's supervisor. (*Id.* ¶ 2.). Dr. Heidi Ondek was the Assistant Superintendent of the Quaker Valley School District. (ECF No. 89–1, at 90.)

Beginning in 2010, Michael worked at various locations within the District, and from 2013–2014 school year, she worked at Osborne Elementary. (*Id.* ¶ 1.)

### i.    *Disciplinary Process*

On March 27, 2014, an incident occurred with a ten-year-old student (T.F.), who was not her assigned student, while Michael was working at the Osborne Elementary School. (*Id.* ¶ 8.) Michael told the student to "quit acting like a jerk," but then immediately apologized to the student and relayed the incident to Dr. Mellett that week or the next week. (*Id.* ¶¶ 9–11.)[3]

Michael's supervisor (Lindenfelser) had documented the following information with respect to Michael's job performance during the 2013–2014 School Year:

---

[1] The facts are taken from the evidence of record that is either undisputed as indicated by the parties, or not fairly disputed on the record. Disputed facts are viewed in the light most favorable to the nonmoving party in accordance with *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[2] For efficiency, the Court omits separate citations to Plaintiff's Response, where Plaintiff clearly admits to a fact contained in Defendants' Statement of Material Facts. Similarly, the Court omits separate citations to Defendants' Response to Plaintiff's Statement of Material Facts where Defendants clearly admit to a fact contained in Plaintiff's Statement of Material Facts. The Court further omits duplicative citations to both parties' statements of facts where the parties allege identical facts.

[3] For ease of reference, the Court will refer to this incident as the "jerk" incident.

- September 11, 2013: Lindenfelser spoke with Michael about not putting her hands on her assigned student, [V] or touching him in any way to gain compliance.
- September 12, 2013: Lindenfelser spoke with Michael about building a positive relationship with [V]. Encouraged her to maintain a 4:1 ratio of interactions – four positive interactions for every corrective interaction.
- November 4, 2013: Parent reported to Lindenfelser and another teacher that her daughter is very upset by the way Michael treats [V]. After the conference was over, immediately reported the conversation to Mellett and Dr. Hoover.
- November 11, 2013: Student reported to Lindenfelser that she was upset about Michael's "bad attitude" and how she is mean to children. Lindenfelser spoke with Linda about appropriately interacting with [V]. Michael sent Lindenfelser pictures via text message of [V] misbehaving. Lindenfelser instructed Michael to never send pictures via text message as this was not the first time she had done that.
- Early January, 2014: After consulting with Mellett, Lindenfelser developed a new schedule for Michael so she would not work with [V] from 1:30–3:30.
- January 20, 2014: Hoover and Mellett met with Michael to discuss interactions, [and her] request for transfer to work with a different student. This meeting was at both Michael's and the administration's request.
- February 7, 2014: Lindenfelser spoke with Linda about her desire for wanting to be here and told her about concerns brought forth by students and parents.
- Mellett has met periodically with Michael to discuss strategies on how to work with her student.

(*Id.* ¶ 4.)[4] Lindenfelser provided this summary to Mellett before the disciplinary meeting with

Michael. (*Id.* ¶ 5.) Michael testified in her deposition that she was counseled for several items on

the summary. (*Id.* ¶ 6.)

---

[4] Plaintiff has objected to this and numerous other facts on the ground that they are either a description of hearsay or a hearsay statement and therefore cannot be considered for summary judgment purposes. (*See* Pl.'s CSMF, ¶¶ 3–4, 26–27, 31, 40, 57, 59.) Hearsay is not entirely precluded from consideration on summary judgment, but rather will be precluded unless such a statement is incapable of admission at trial. *See Stelwagon Mfg. Co. v. Tarmac Roofing Sys.*, 63 F.3d 1267, 1275 n.17 (3d Cir. 1995); Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

As a preliminary matter, none of the statements to which Plaintiff objects are definitional hearsay because they are not offered for "the truth of the matter asserted in the statement." *See* Fed. R. Evid. 801(c)(2). The claims in this case do not depend on whether the allegations against Michael were actually true or false, or the truth of any claims about Michael's job performance. Rather, the questions in this case are whether Michael received sufficient pre-deprivation due process and whether the administration's true motivation was in retaliation for Michael exercising free speech. To the extent that Michael raises any meritorious hearsay objections to any statements in Defendant's CSMF, the Court will note them.

On April 1, 2014, Mellett reported the March 27, 2014, incident as well as the ongoing issues with Michael's performance, to Dr. Ondek in an email. Dr. Mellett decided to have a formal disciplinary meeting with Michael and implement a formal improvement plan. (*Id.* ¶ 13.) In the email, she detailed the interactions she had with Michael and stating that it was time to move forward with a program of improvement. (*Id.*) She also said that she "will write a letter requesting her presence at a meeting and she can have union representation. Sally [Hoover] and I will meet together with [Michael] and whomever she brings along." (*Id.*)

On or about April 1, 2014, G.F.,[5] father of T.F., emailed Mellett to report that Michael had an inappropriate interaction with his son, and set up a meeting with Mellett for April 7, 2014. (*Id.* ¶ 14.) Dr. Mellett responded that she was dealing with the situation as a personnel matter. (*Id.* ¶ 15.) Mellett thought that in his email, G.F. was referring to the March 27, 2017, incident in which Michael referred to T.F. as a "jerk." (*Id.* ¶ 16.)

On April 2, 2014, Mellett hand-delivered a letter to Michael notifying her of a meeting on April 4 "to discuss an incident that occurred with a student during PSSA testing," and inviting Michael to bring union representation. (*Id.* ¶ 17.) On April 4, 2014, Michael met with Mellett, Director of Student Services Dr. Hoover, and Union President Cheryl Savage to discuss the March 27, 2014 incident. (*Id.* ¶ 18.) Mellett testified that during the meeting, the parties discussed the March 27 incident as well as ongoing issues with Michael's allegedly inappropriate interactions with students throughout the year. (*Id.* ¶ 20.) During the meeting, Michael was given the opportunity to tell her side of the story. (*Id.* ¶ 21.) Michael expressed that she felt unprepared to meet the needs of her primary assigned student, in part because she was not given a copy of the student's IEP. (*Id.* ¶ 14; Pl.'s Responsive Statement of Material Facts ("Pl.'s CSMF"), ECF No. 100, ¶ 20.)

---

[5] The Court will use the abbreviation "G.F." to safeguard the identity of G.F.'s minor child, T.F.

By letter to Michael dated April 8, 2014, Dr. Mellett summarized the meeting to have included concerns about Michael following plans as well as Michael's interaction with her primary assigned student and outlined Dr. Mellett's intention to develop an improvement plan for Michael with a specific timeline. (*Id.* ¶ 23.) In the letter, Mellett recalled that "you acknowledged that you did say to a student that he was, ' . . . acting like a jerk.' This was primarily due to a choice the student was making about his behavior." (*Id.*)

Michael disagreed with the contentions in the letter, and challenged them with her own version of events in writing, on April 9, 2017. (*Id.* ¶ 24; Pl.'s CSMF ¶ 24.)

On April 7, 2014, Mellett met with T.F.'s parents. (*Id.* ¶ 25.) T.F.'s father described an incident in which Michael put her hands on his son. (*Id.* ¶ 26.) T.F.'s father discussed the incident's severity and how it was affecting his son. (*Id.* ¶ 27.) Mellett recalled that the parents told her that Michael "put her hands-on [T.F.] digging her hand into his arm," and "grabbed [T.F.]'s arm and dug her hand or fingernails into his arm." (*Id.* ¶ 31.)[6] G.F. was not aware of the March, 27, 2014 "jerk" incident. (*Id.* ¶ 14.) Based on his son's report, G.F. figured that the hands-on incident occurred sometime during the last week of March, 2014. (*Id.* ¶ 29.) The April 7 meeting, however, was the first time Mellett or anyone in the administration learned of this other incident. (*Id.* ¶ 30.)

Next, Mellett informed Dr. Ondek of the "hands-on" incident, and Ondek directed her to further investigate. (*Id.* ¶ 32.) Ondek described the process that she followed after receiving the report.

> A. I did what I always do when I receive a report such as this one where a child may have been harmed. I directed the principal to see that an investigation was conducted and that the child was properly interviewed, and that happened. The guidance counselor documented by interviewing [T.F.] and recorded his responses, and that was the report that was shared with me.

[6] For ease of reference, the Court will refer to this incident as the "hands-on" incident.

Q. What action, if any, did you take from that report?

A. A letter was issued to Linda Michael calling her to a meeting, informing her of her right to have representation, and we presented to her the findings.

Q. Was this a second letter or the second meeting or?

A. This would have been for Linda a second meeting but with me the first meeting.

(*Id.* ¶ 33.)

Mellett interviewed the students who were with Michael when she allegedly put her hands on T.F. (*Id.* ¶ 35.) The students did not have any conclusive information. (*Id.*) Mellett informed Michael on April 8, 2014, that she was conducting another investigation that was not yet complete, that there could be another disciplinary meeting, and that she should avoid contact with T.F. (*Id.* ¶ 35.) Mellett also interviewed T.F. about the incident shortly after her meeting with T.F.'s parents and on several other occasions. (*Id.* ¶ 36.) Mellett said that she spoke to T.F. on multiple occasions "[f]or clarifications and/or to make sure that we were doing what we needed to in terms of getting as much information as possible." (*Id.* ¶ 37.)

On April 11, 2014, Ondek gave Michael written notice of a second meeting, to be held on April 22, 2014, pursuant to the collective bargaining agreement, "to address performance issues," and inviting Michael to bring union representation. (*Id.* ¶ 38.) At the April 22, 2014, meeting, according to Michael, Mellett told her that "there had been serious allegations made by the student that I grabbed him by the wrist which according to Dr. Mellett lasted about 15 seconds and on a scale of 1 to 10 was 'about a 5' according to the student." (*Id.* ¶ 40.) Michael alleges that the April 22 meeting was the first time she was informed about the hands-on incident. (*Id.* ¶ 41.)

It is disputed whether at the April 22 meeting, Michael admitted that she put her hands on T.F. (*Id.* ¶ 14.) According to Mellett, Michael admitted to putting her hand on [T.F.]'s wrist. (*Id.* ¶ 44.) Dr. Ondek also said that Michael admitted to putting her hands on T.F. (*Id.* ¶ 45.) In her

6

deposition, Michael said that she was confronted with the allegations against her, knew about the incident in question, and had the opportunity to tell her side of the story:

> Q. But you understood the time they were talking about?
> A. I remember, yes. I always acknowledged that. I never denied that I escorted those boys to the office -- or to the guidance office, not to the principal's office.
> Q. Did they describe that to you? When they said there was this incident, did they describe it's when you escorted three people to the --
> A. Yes.
> Q. And you remembered that at that time?
> A. Yes.
> Q. And so then you told them what happened?
> A. Yes. And that's when Dr. Mellett said that she had interviewed -- I don't know the student or the parents or whoever. The allegation was that I had dug my fingernails into his wrist and escorted him down, you know, physically escorted him down to the office. I did. I walked with the three boys.
> Q Did you have the opportunity in that meeting to tell your side of the story?
> A. I did.
> Q. Okay. And you did do that?
> A. I did. I said just like I just told you.
> Q. And the way you described it before also?
> A. Correct.
> Q. And that's how you described it in that meeting?
> A. Yes, it is.

(*Id.* ¶ 49.)

After the April 22, 2014, meeting, Michael was notified in writing that she was being suspended with pay pending further investigation. (*Id.* ¶ 50.) In conducting the further investigation, Mellett asked the school counselor, May Ann Bergandy, to interview T.F. on April 23, 2014. (*Id.* ¶ 51.) Mellett explained that in her opinion, it was good practice to have the school counselor talk to the students in such situations, and that she and the counselor would often interview students more than once. (*Id.* ¶ 52.) Bergandy testified in her deposition that she is not involved in disciplining students. (*Id.* ¶ 53.) Nor is she Michael's supervisor. (*Id.* ¶ 54.)

Mellett gave Bergandy a questionnaire to use in interviewing T.F. (*Id.* ¶ 54; Pl.'s CSMF, ¶ 55.) On April 23, 2014, Bergandy interviewed T.F., reading the questions from the

7

questionnaire and recording, as close to verbatim as possible, T.F.'s responses. (*Id.* ¶ 56.)

Bergandy recorded the following statements by T.F. regarding the incident:

> Can you recall what happened in the art class during PSSA testing when there was sub and you, [Bob], and [Joe] got into some trouble?
> *[Bob] and [Joe] were drawing inappropriate things. Mrs. Michael told them to stop. They didn't. They came over to show me the drawing. I started laughing. I went to sharpen pencil and Mrs. M. yelled at me to sit down. I said, I had to sharpen my pencil. Then I sat down.*
> Why were you sent to Mrs. Bergandy?
> *Mrs. M. thought I was fooling around but I wasn't.*
> Who sent you there?
> *Mrs. M. grabbed my wrist and started pulling me. I didn't know where she was taking me. She held my wrist the whole way down to your office.*
> How did you feel about an adult taking your hand/wrist?
> *I was wondering where she was taking me. She said "you know where I am taking you." But I didn't know. It hurt – she squeezed really hard on a scale of 1-10 – it hurt 7.*
> Why did you feel that way?
> *Hurt-because she was squeezing. Her nails were digging into the side of my hand.*
> What do you think about all of this?
> *I don't know. I don't think I needed to be taken to the guidance office because I didn't do anything wrong.*

(*Id.* ¶ 57.)

Bergandy considered T.F. to be credible. (*Id.* ¶ 58.) T.F.'s responses to Bergandy were consistent with the statements he had previously made to Mellett. (*Id.* ¶ 59.)

In a deposition in this lawsuit, T.F. testified that he recalled the incident with Plaintiff involving her "dragg[ing] [him] by the arm" while escorting him to the counselor's office. (Pl.'s Supp. Responsive Concise Statement of Material Facts ("Pl.'s Supp. CSMF"), ¶ 101; Def.'s Response to Pl.'s Supp. CSMF ("Def.'s Supp. CSMF"), ¶ 101.) He testified "[w]ell, we were – someone drew something on a paper and I started – I laughed at it. And then she took me by the arm, and she was, like, digging her nails in my arm. And she brought me down to the guidance counselor's office." (Def.'s Supp. CSMF, ¶ 102 (quoting T.F. Dep. Tr., ECF No. 109–1, at 9:15–20).) He testified that the touching began in the classroom in the presence of his teacher, but that

8

she did not see the incident, and that no other students were present during the walk to the counselor's office. (Def.'s Supp. CSMF, ¶ 102; Pl.'s Supp CSMF ¶ 102.). He could not recall meeting with Dr. Mellett after the hands-on incident. (*Id.* ¶ 103.)[7]

After the investigation was complete, the District held another hearing with Michael and her union representative on April 28, 2014. (Def.'s CSMF, ¶ 60.) Michael testified that at that meeting, the parties discussed the hands-on incident and was given the opportunity to tell her version of events again. (*Id.* ¶ 61.) Michael further testified that the incident was discussed in both meetings, but described with more detail at the April 28 meeting. (*Id.* ¶ 62.)

At the conclusion of the meeting, Michael continued to be suspended with pay while the parties negotiated a severance agreement. (*Id.* ¶ 63.) When those negotiations reached an impasse, in October, 2014, Michael's status was changed to "suspended without pay." (*Id.* ¶ 64.) By letter of April 20, 2015, Michael was offered employment as a cashier in the Cafeteria without direct care responsibilities of students. (*Id.* ¶ 65.) She declined the offer. (*Id.* ¶ 66.)

### ii. 2012 School Board Meeting

In November of 2011, Michael was elected as a Council member in Leetsdale Borough, a municipality within the District. (*Id.* ¶ 75.) She took office in January 2012. (*Id.*) Quaker Valley's School District Facilities and Operations Committee held a meeting in March of 2012, at which community members questioned Quaker Valley's purchase and potential taking of residential properties for use as a parking lot and/or drop-off zone for Quaker Valley High School. (*Id.* ¶ 76.) Michael attended the meeting, and spoke about the plan. (*Id.* ¶ 77.) She testified in her deposition that she was "newly elected and fervent," and "wanted to represent her

---

[7] T.F.'s current recollection of the facts does not create a genuine issue of material fact for purposes of whether Michael received due process or whether the District had a retaliatory motive for the disciplinary action. Any discrepancies between his testimony and other individuals' recollection of the events is therefore immaterial.

9

constituents." (*Id.* ¶ 81.) She said that she and her husband and School Board Member G.F. "had words" during the meeting after she spoke. (*Id.* ¶ 82.) G.F., who is T.F.'s father, recalled that the Michaels spoke at School Board Meetings in early 2012, but stated that there was no "verbal altercation." (*Id.* ¶ 84.) There was no evidence that G.F. had personal animus against Michael, but G.F. opined that the Michael family had some sort of unknown animus against him. (*Id.* ¶ 85.) Ultimately, the project was not completed, and the properties the District had purchased were sold in 2017. (Pl.'s CSMF ¶ 98.)

No one from the District ever mentioned Michael's employment with the District in connection with her activities at Leetsdale Borough or her speech at a School Board Meeting. (Def.'s CSMF ¶ 86.) Neither G.F. nor any other School Board Member participated in the decisions to suspend Michael with pay, to continue the suspension with pay, or to suspend her without pay. (*Id.* ¶ 87.) Michael testified that she has no evidence of any connection between her political opinions and her termination. (*Id.* ¶ 88.)

## B. Procedural history

Plaintiff instituted this lawsuit on April 20, 2016. The operative complaint is the Second Amended Complaint ("SAC" or "Complaint"), ECF No. 16, which brought three (3) separate claims for relief against Quaker Valley, Mellett, Ondek, and the Quaker Valley Educational Support Personnel Association, Unit I (the "Union"). Michael later voluntarily dismissed the claims against the Union. On Defendants' motion, the Court dismissed claims against Mellett and Ondek, and claims against Defendants for denial of post-deprivation due process. Remaining in the case are Count I, First Amendment Retaliation, against Quaker Valley, and Count II, for denial of pre-deprivation due process, against Quaker Valley.

10

Quaker Valley filed a Motion for Summary Judgment, ECF No. 85, and a brief in support

therein. Plaintiff filed a Response in Opposition, ECF No. 98, and a brief in support therein.

Defendant filed a Reply, ECF No. 102. The Court then entered an order deferring ruling on the

Motion and authorizing certain discovery, ECF No. 104, including taking the deposition of T.F.

The Court held Oral Argument on the Motion on June 5, 2018 (ECF No. 115.) The Court has

reviewed the entire record in this case, and the applicable law. The Motion is ripe for disposition.

## II.    **LEGAL STANDARD**

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing

to particular parts of materials in the record, including depositions, documents, electronically

stored information, affidavits or declarations, stipulations (including those made for purposes of

the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P.

56(c)(1)(A).

Once that burden has been met, the non-moving party must set forth "specific facts

showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by

the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574 (1986) (quoting Fed. R. Civ. P. 56(a) & (e)). To meet its

burden, the "opponent must do more than simply show that there is some metaphysical doubt as

to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party "must present

affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert

factually unsupported allegations." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d

Cir. 1989). Moreover, a party's labelling or characterizing a fact as "disputed" does not make it

so—the record evidence the opposing party points to must support the dispute of fact, whether through reasonable inference or otherwise. If the non-moving party's evidence merely is colorable or lacks sufficient probative force, summary judgment must be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See id.* at 250. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587; *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009).

In reviewing the record evidence, the court draws all reasonable inferences in favor of the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "The line between reasonable inferences and impermissible speculation is often 'thin,' *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 474 (3d Cir. 1985), but nevertheless is critical because 'an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014) (quoting *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir. 1990)). Any inference must follow directly from admissible evidence. *See Anderson*, 477 U.S. at 255.

It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See id.*; *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48. "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to his case." *See Podobnik*

*v. U.S. Postal Serv.*, 409 F.3d 584, 589 (3d Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 323–24).

## III.    DISCUSSION

Section 1983 is the statutory means to vindicate the alleged violation of federal rights conferred in federal law, but is not itself a source of substantive constitutional rights. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989). Michael's Complaint identifies two sources of the rights she contends were violated—the guarantee of free speech in the First Amendment to the United States Constitution and the guarantee of due process in the Fourteenth Amendment. Quaker Valley contends it is entitled to summary judgment on both her claims because Plaintiff has failed to adduce evidence from which a reasonable jury could find in her favor.

### A.    First Amendment Retaliation

In Count I, Michael sues Quaker Valley pursuant to § 1983 for First Amendment violations, contending that she was suspended and effectively terminated in April, 2014, in retaliation for protected First Amendment speech made at the March, 2012, School Board Meeting in opposition to Quaker Valley's plans for the parking lot. She asserts that the investigation of the "hands-on" incident was pretextual and that a School Board member (G.F.)'s accusations launched a sham investigation into the allegations, ultimately resulting in her suspension and termination.

In order for Michael, as a public employee, to succeed in establishing a First Amendment claim for retaliation in her suspension, termination, and/or demotion, she "must show that [her] speech is protected by the First Amendment and that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." *Flora v. Cty. of Luzerne,* 776 F.3d 169, 174 (3d Cir. 2015) (citing *Gorum v. Sessoms,* 561 F.3d 179, 184 (3d Cir. 2009)). The

13

causation element may be established by setting out: "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link, or . . . evidence gleaned from the record as a whole [from which] the trier of the fact should infer causation." *Lauren W. ex rel. Jean W. v. DeFlaminis,* 480 F.3d 259, 267 (3d Cir. 2007) (internal quotation marks and citations omitted). A plaintiff must also show that retaliatory acts are not *de minimis* but are significant enough that they would "deter a person of ordinary firmness from exercising his First Amendment rights." *McKee v. Hart,* 436 F.3d 165, 170 (3d Cir. 2006).

Quaker Valley argues that it is entitled to summary judgment on Plaintiff's First Amendment retaliation claim because she has not set forth evidence establishing a sufficient causal nexus between the protected speech and adverse action. Quaker Valley asserts that Michael has provided no evidence that could show a link between her speech and her suspension and termination. As stated in *Fouse,* a causal connection can be shown: (1) by an unusually suggestive temporal proximity; (2) a pattern of antagonism coupled with timing; or (3) evidence gleaned from the record as a whole from which a reasonable jury could infer causation.[8] *Fouse,* 2015 WL 1967242, at *8 (citing *Lauren W. ex rel. Jean W.,* 480 F.3d at 267).

### a. Temporal Proximity

The parties agree that Plaintiff engaged in protected speech at the school board meeting. Michael alleged in her Complaint that she engaged in First Amendment protected speech in the

---

[8]*Cavicchia v. Phila. Hous. Auth.,* No. 03-0116, 2003 WL 22595210, at *9 (E.D. Pa. Nov. 7, 2003), *aff'd,* 137 F. App'x 495 (3d Cir. 2005), observes:

> Pretext analysis used in Title VII cases is also useful in deciding First Amendment retaliation claims. *See Feldman v. Phila. Hous. Auth.,* 43 F.3d 823, 831 (3d Cir. 1994) (discussing pretext in determining causation in First Amendment retaliation claim); *see also Azzaro v. County of Allegheny,* 110 F.3d 968, 981 (3d Cir. 1997) (holding that Title VII causation standards are relevant in evaluating causation under First Amendment).

14

Fall of 2013 and that on or about April 4, 2014 she was called to a meeting to discuss her conduct towards a student. However, the undisputed facts now show that Plaintiff made her protected speech at a meeting on March 20, 2012.

While the Third Circuit has not established a bright-line rule for the requisite temporal proximity between protected speech and disciplinary action, the Court has recognized that a three-month gap between the protected activity and termination is not enough to show an unusually suggestive temporal proximity. *LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007).

Here, Plaintiff engaged in the protected speech at issue in March, 2012, and disciplinary proceedings against her began in April, 2014. She was suspended without pay in October of 2014. This gap of 31 months between protected activity and suspension without pay does not suffice, as a matter of law, for the Court to infer a causal nexus based upon temporal proximity. Even the 25-month gap between Plaintiff's protected speech and the disciplinary meetings is insufficient.

Plaintiff further claims that the issue she discussed at the 2012 Meeting was an "ongoing issue in the community" during the time of the events leading up to her termination, because the District acquired the property in 2012 and wound up selling it in 2017. (Pl.'s Reply, at 7.) Plaintiff appears to suggest that this ongoing concern shows that her suspension related to her protected speech. But regardless whether the purchase was still controversial within Quaker Valley District, and regardless whether Plaintiff remained opposed to the land acquisition, the controversy's continued vitality does not close the temporal gap between Plaintiff's protected speech on the matter (which the record evidence reflects only occurred in 2012) and the disciplinary meetings.

15

However, the lack of suggestive timing alone does not resolve the issue, since:

It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides [one] evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.

*Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 178 (3d Cir. 1997) (Title VII retaliation context).

### b. Pattern of antagonism coupled with timing

Quaker Valley also argues that Michael has not provided any facts from which a jury could conclude that there was a pattern of antagonism sufficient to establish causation.

The mere fact of the disciplinary meetings and hearings, though they culminated in retaliatory action, would not tend to show an alleged "pattern of antagonism" to support causation between her speech and her challenged discipline—as such would be a mere bootstrapping as to causation. *See Boyd v. Citizens Bank of Pennsylvania, Inc.*, No. 12-0032, 2014 WL 2154902, at \*28 (W.D. Pa. May 22, 2014) ("[T]he occurrence of disciplinary action following protected activity does not establish a pattern of antagonism."). The Court agrees that Plaintiff has not set forth any other facts from which a reasonable jury could conclude there was a pattern of antagonism to support causation.

### c. Record as a whole

Where temporal proximity is insufficient, and the construct of "allegations as to protected activity followed by a period of antagonism" likewise fails, causal connection may be shown when the allegations "looked at as a whole, may suffice to raise the inference." *Kachmar*, 109 F.3d at 176.

16

In *Kachmar*, for example, the court found the plaintiff's claim, which involved opposition to discrimination, sufficient where she asserted that before her termination and following her protected activity, which in that case involved opposition to discrimination, her supervisor had commented in her review that "she was not on the management track" because of her "feminist campaigning," and also following additional protected activity she had been told by management to look for another job. *Id.* at 178.

The Third Circuit has cautioned that in viewing the record to determine whether causation can be gleaned from it as a whole, there are "no limits set on what [the Court has] been willing to consider," *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000), and the court should use a "wider lens" and consider a broad array of circumstances to show causation. *Id.* at 284. For instance, such an inference may arise when an employer gives inconsistent reasons for termination, *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986), takes a series of seemingly benign actions that paved the way for an employee's termination, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997), or attempts to provoke the employee by continually disciplining him for minor matters and miscalculating the amount of time he worked, *Robinson v. Se. Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993). A false justification for the retaliatory action may also support causation. *Waddell*, 799 F.2d at 73. Likewise, in *Godfrey v. Upland Borough*, the Court determined that the plaintiffs had stated a claim for First Amendment retaliation for statements made at a public meeting where the defendant subsequently forced the plaintiffs to defend against a meritless citation. 209 F. Supp. 3d 804, 808 (E.D. Pa. 2016).

Plaintiff argues that Quaker Valley's investigation of the "hands-on" incident was pretextual, in retaliation for her exercise of free speech two years earlier.

17

First, she points to what she characterizes as a "sham investigation" as evidence of pretext. She points to the fact that G.F. did not describe with specificity the alleged hands-on incident when he emailed Dr. Mellett, and argues that only after Mellett met with G.F. did the accusation come to involve grabbing T.F.'s wrist. She also points to what she believes are flaws in Mellett's investigation, including that Mellett did not take notes on her initial conversations with the individuals involved, that she did not establish the date of the alleged incident with the students, and that she developed a questionnaire including leading questions, for the interview Bergandy conducted with T.F.

However, the law does not require that a pre-deprivation investigation be extensive or conclusive. The investigation in question was straightforward: A student made an accusation against a teacher through his parents. Administration met with the parents, and interviewed the student several times. The Principal also interviewed the other students who were escorted to the office and the teachers involved. The Principal and Superintendent then had a meeting with the teacher (Michael) to discuss the accusation and get her side of the story. Both the Principal and Superintendent had the impression that Michael admitted to putting her hands on the student. The Principal then had the school counselor interview the student and record his answers to a formal questionnaire, and then met with Michael a second time.

None of the facts Michael sets forth support a pretext inference. That G.F. chose to communicate a serious allegation of physical contact in person rather than by email could not lead a reasonable jury to conclude that he and Mellett were drumming up accusations against Plaintiff. Moreover, the undisputed facts reflect that Mellett assumed that G.F was referring to the "jerk" incident rather than the "hands-on" incident in his email, and that is why she did not mention the hands-on incident in the first meeting with Plaintiff. Nor could any reasonable jury

18

conclude from Plaintiff's challenge to the questionnaire that the investigation was pretextual. The questionnaire may not have been in Plaintiff's preferred format, or presented in a light favorable to Plaintiff, but she has adduced no evidence of an improper purpose for the questionnaire. No reasonable jury could conclude that the investigation was pretextual.

Moreover, even if Michael had consistently denied that the incident took place, her version of the facts does not matter. What matters is whether the decisionmakers had reason to believe the accusations. Given the record of Michael's negative interactions with her primary assigned student throughout the school year, no reasonable jury could conclude that the decisionmakers had *no* reason to believe T.F.'s accusation.

The two facts that could be considered in support of causation, are: (1) the student who Michael put her hands on (T.F.) was the son of a Board Member who was present at the meeting where Michael spoke two years before; and (2) G.F. opined that Michael had some kind of vague animus against him. No reasonable jury could infer causation on the basis of these facts. Here's why.

Viewing the record as a whole, the undisputed facts show that the decision to suspend Michael was made by the Assistant Superintendent, Ondek, with input from Principal Mellett. The School Board, of which G.F. was a member, was not involved. Moreover, the decisionmakers involved in suspending and eventually terminating Michael had a record before them of her poor job performance, including problematic interactions with her assigned student as well as with T.F. Plaintiff has set forth no evidence from which a jury could conclude that Mellett and Ondek were aware of any of Michael's political activities or opinions, that she had made a speech at a School Board meeting two years earlier, or of the speech's content. Mellett and Ondek both testified that although the incidents in April 2014 precipitated the disciplinary

19

meetings, they were not the sole reason for Michael's suspension. Even Michael admitted that she knew her behavior was wrong.

Michael further admitted that no one threatened her job in response to her protected speech, that no one mentioned her job when she spoke out against the District's parking lot plans, and that she had no interactions with anyone in the District concerning her comments at the meeting. Even viewing the evidence with the "wide lens" as the Third Circuit has instructed the Court to do, there is no factual issue to go to the jury as to whether Michael was retaliated against.

## B. Procedural Due Process

Quaker Valley also argues that is entitled to summary judgment in its favor on Plaintiff's claim for denial of pre-deprivation due process. Plaintiff counters that there remain disputed issues of material fact regarding the adequacy of the pre-deprivation hearing process.

"To prevail on a procedural due process claim, a litigant must show (1) that the state deprived him of a protected interest in life, liberty, or property and (2) that the deprivation occurred without due process of law." *Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 285 (3d Cir. 2008). "The essential requirements of due process . . . are notice and an opportunity to respond." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985). Furthermore, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Posey v. Swissvale Borough*, No. 12–955, 2013 WL 989953, at *15 (W.D. Pa. Mar. 13, 2013) (quoting *Mathews v. Eldridge,* 424 U.S. 319, 332, (1976)).

Due process is a flexible concept and the deprivation of property entitles Plaintiff to such process and procedural protections as the situation demands. *Eldridge*, 424 U.S. at 335. "Our focus, then, rests upon the question of due process. 'We must bear in mind that no single model

20

of procedural fairness, let alone a particular form of procedure, is dictated by the Due Process Clause.'" *Dykes v. Se. Pennsylvania Transp. Auth.*, 68 F.3d 1564, 1571 (3d Cir. 1995) (quoting *Kremer v. Chemical Construction Corp.*, 456 U.S. 461, 483, (1982)).

Plaintiff's suspension without pay would constitute the requisite deprivation for due process purposes, *Skrutski v. Marut*, 288 F. App'x 803, 808 (3d Cir. 2008), as could her termination from her full-time employment as a paraprofessional. Indeed, *Schmidt v. Creedon* recognized that "absent extraordinary circumstances, due process requires notice and a hearing prior to suspension without pay, even where union grievance procedures, after the fact, fully compensate erroneously suspended employees." 639 F.3d 587, 597 (3d Cir. 2011).

"Our Court of Appeals has held that, where a plaintiff has a property interest in employment, due process generally requires a pre-deprivation hearing." *Gilson v. Pennsylvania State Police*, 175 F. Supp. 3d 528, 544 (W.D. Pa. 2016), *aff'd*, 676 F. App'x 130 (3d Cir. 2017). There is no *per se* requirement for any elaborate pre-deprivation hearing. *Loudermill*, 470 U.S. at 545; *Schmidt*, 639 F.3d at 596–97.

> Where adequate post-deprivation procedures are available, an employee is entitled only to [pre-deprivation] notice of the charges against him, *an explanation of the employer's evidence*, and an opportunity to present his side of the story. The hearing can be informal and need not definitively resolve the propriety of the deprivation. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. An employee is generally not entitled to notice of the reasons for his discharge in advance of a pre-deprivation hearing, or to present his case to an impartial decision-maker at such a hearing.

*Schmidt*, 639 F.3d at 596–97 (internal quotations and citations omitted) (emphasis added).

Violation of the requirement to provide an adequate pre-deprivation hearing is a claim separate from that based on a denial of required post-deprivation process. Ordinarily, with no

21

constitutionally adequate pre-deprivation hearing, "a complete constitutional violation has (allegedly) already occurred; if the Constitution requires pre-termination procedures, the most thorough and fair post-termination hearing cannot undo the failure to provide such procedures." *Alvin*, 227 F.3d at 120.

Quaker Valley argues it is entitled to summary judgment on Michael's pre-deprivation claim because she was provided at least three hearings and an opportunity to present her side of the story before her discipline and effective termination. Michael argues that because she was not given a written summary of the evidence against her, or given access to potential exculpatory evidence, she was denied due process.

The undisputed evidence reflects the following: that on April 2, 2014, Mellett hand-delivered a letter to Michael notifying her of a meeting on April 4 "to discuss an incident that occurred with a student during PSSA testing" and inviting her to bring union representation. At that meeting, the parties discussed the "jerk" incident and other ongoing issues with Michael's interactions with students that school year. She was given the opportunity to tell her side of the story.

On April 7, Mellett learned for the first time of the "hands-on" incident. The next day, she gave Michael a letter summarizing the April 4 meeting and the job performance goals resulting from the meeting. Mellett also informed Michael that she was conducting another investigation and advising her to keep her distance from T.F. Michael disagreed with the District's contentions in the letter, and presented her version of the events in writing on April 9.

On April 11, Michael was given written notice by Ondek of a second meeting to be held on April 22, pursuant to the collective bargaining agreement "to address performance issues," and invited Michael to bring union representation. At that meeting, Mellett informed Michael of

22

T.F.'s "hands-on" allegations. Michael testified that at the meeting, she was confronted with the allegations against her, was aware of the incident in question, and had the opportunity to tell her side of the story.

After the April 22 meeting, Michael was notified in writing that she was being suspended with pay. After the investigation wrapped up, the District gave notice and held another hearing with Michael and her union representation on April 28. At that meeting, the parties discussed the "hands-on" incident and Michael had the opportunity to again tell her side of the story. She continued to be suspended with pay while the parties negotiated a severance agreement. During that period, Michael had the opportunity to negotiate a settlement, continue to plead her case, or commence the grievance procedures provided for in the collective bargaining agreement. Michael chose to continue negotiating the settlement.

Michael challenges the notice to her because at the April 22 meeting, she was only orally presented the allegations, without an exact date or description of the evidence the District had collected. She argues this violated due process because she was not provided enough advance notice to fully consider the allegations, talk to potential witnesses, or prepare to defend herself. (Pl.'s Br., at 9.) She further argues that she was provided no notice about the nature of the April 28 meeting, and only received additional details about the "hands-on" allegation at the meeting. She also points out that she did not receive the potentially mitigating evidence that the teacher who sent Plaintiff to the guidance counselor's office with the three boys did not see any contact, or that the two boys with Plaintiff and T.F. did not see Plaintiff take T.F.'s hand. (*Id.*) Michael also challenges the adequacy of Ondek's Nov. 4, 2014, letter informing Plaintiff of her suspension without pay, which said Plaintiff would receive a "statement of charges" and never delivered.

23

Determining adequacy of notices requires considering both its content and timing. *Gniotek v. City of Philadelphia*, 808 F.2d 241, 244 (3d Cir. 1986). "Notice is sufficient, 1) if it apprises the vulnerable party of the nature of the charges and general evidence against him, and 2) if it is timely under the particular circumstances of the case." *Gniotek*, 808 F.2d at 244.

Quaker Valley asserts that where additional post-deprivation process and judicial review is available through the collective bargaining unit and state law, an employee is entitled only to pre-deprivation notice, an explanation of the employer's evidence, and an opportunity to present his side of the story. Thus, Quaker Valley argues, the hearings and opportunity to tell her side of the story satisfied the *Loudermill* standard. Defendant contends that the process here, involving multiple informal hearings and providing written and oral dialogue between the parties, allowed Plaintiff to present her side and alert that School Board that there was a dispute about the facts in order to reduce error on the decisionmakers' part.

Defendant is correct that perfect or comprehensive notice is not constitutionally required. "Due process does not require an employer to provide every piece of evidence relevant to an employee's termination. . . . [P]retermination notice of the charges and evidence against an employee need not be in great detail as long as it allows the employee the opportunity to determine what facts, if any, within his knowledge might be presented in mitigation of or in denial of the charges." *Ashton v. Whitman*, 94 F. App'x 896, 900–01 (3d Cir. 2004)).

Here, no jury could conclude that Michael did not have sufficient pre-deprivation notice. The only pre-deprivation evidence was T.F.'s accusation. There was never any dispute as to the student's identity or whether he was accusing Michael or another individual. Moreover, at the April 22 and April 28, meetings she was informed of the allegations and evidence against her. She testified that she was aware of the incident in question and was given the opportunity to tell

her story each time, and to follow up in writing afterwards. Even if she was unaware of the allegations before the April 22 meeting, she certainly was aware of them before the April 28 meeting. As noted, a pre-deprivation hearing "need not definitively resolve the propriety of the discharge," and is merely "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill*, 470 U.S. at 545–46. Moreover, Plaintiff's protestations that she did not receive the formal written charges or that the Solicitor failed to follow the collective bargaining agreement, relate to *post*-deprivation due process, not at issue here.

Plaintiff has advanced no evidence that Quaker Valley did not have reasonable grounds to believe that the charges against her were true. Whether the incident actually occurred as T.F. (or, for that matter, Plaintiff) described it does not matter for these purposes. What does matter is whether Plaintiff was given notice of the accusations and an opportunity to be heard, and the undisputed facts show that she was afforded both. Quaker Valley is therefore entitled to summary judgment on the pre-deprivation due process claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted.

An appropriate Order will follow.

Mark R. Hornak
Chief United States District Judge

Dated: March 26, 2019

cc:    All counsel of record